ATTORNEYS FOR PLAINTIFFS
Steven W. Griesemer
Gary P. Price
Joseph P. Rompala
Indianapolis, Indiana

ATTORNEY FOR DEFENDANTS
Mark J. Crandley
Indianapolis, Indiana

FILED
Mar 15 2012, 1:08 pm
CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

No. 94S00-1112-CQ-692

MICHAEL R. KOLE, JOSEPH L. WEINGARTEN,
AND GLENN J. BROWN, INDIVIDUALLY AND
ON BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

*Plaintiffs,*

v.

SCOTT FAULTLESS, DANIEL HENKE, EILEEN
PRITCHARD, STUART EASLEY, DAVID
GEORGE, ARTHUR LEVINE, INDIVIDUALLY
AND IN THEIR OFFICIAL CAPACITY AS THE
TOWN COUNCIL OF FISHERS, INDIANA, AND
FALL CREEK TOWNSHIP,

*Defendants.*

Certified Question from the United States District Court for the Southern District of Indiana
No. 1:10-CV-1735-TWP-DML
The Honorable Tanya Walton Pratt, Judge

**March 15, 2012**

**Shepard, Chief Justice.**

In 2006, the Indiana General Assembly liberalized the framework within which local governments may reorganize themselves. It is clear that this new framework substantially

reduces the barriers to rearranging local units. This case asks to what extent earlier statutes continue to limit the resulting forms that reorganizing local governments may take.

In particular, Judge Tanya Walton Pratt of the U.S. District Court for the Southern District of Indiana has asked us the following question, certified under Indiana Appellate Rule 64(B):

> Whether a political unit may reorganize into a city under Ind. Code art. 36-1.5 (the "Reorganization Act") in a manner that eliminates voting rights recognized under Ind. Code § 36-4-5-2 and Ind. Code § 36-4-6-3(i), including reorganization as a city with (1) a council elected entirely at large; and (2) a mayor appointed by that council.

We have accepted this question and now hold that Article 1.5 of Title 36 does allow a political subdivision to do so.[1]

## Background

Over 76,000 people reside in the Town of Fishers, making it the largest town in Indiana—more than twice as large as the next largest town—and the eighth largest municipality overall.

The present structure of the Town of Fishers adheres to the standard arrangement for towns as set out in Article 5 of Title 36 of the Indiana Code. Citizens of the Town elect a Town

---

[1] The parties and the District Court have taken to calling Article 1.5 of Title 36 the Reorganization Act. To avoid confusion with other provisions in other articles of Title 36 that provide for annexations, disannexations, and mergers of political subdivisions, we refer to Article 1.5 using the name the Legislature gave it—Government Modernization.

Council at large. The Town Council, in turn, selects a Town Board President from among its own members.

On May 3, 2010, some 1700 citizens of the Town of Fishers—the Plaintiffs among them—filed a petition with the Fishers Town Clerk seeking a referendum on whether the Town should convert itself from a town into a second class city. Under the standard structure for second class cities as set out in Article 4 of Title 36, citizens directly elect a city mayor for the city, plus six city council members from legislative districts and three more at large.

On May 5, 2010, two days after receiving the petition, the Fishers Town Council passed a resolution proposing a reorganization with Fall Creek Township. The resolution called for a commission to study the possibility of merging the two entities into a reorganized city. The authority for such a merger is the Government Modernization Act, a recently enacted statute that appears as Article 1.5 of Title 36.

As proceedings on the Town Council's proposal moved forward, the Plaintiffs' petition did not. The Plaintiffs filed suit in Hamilton Superior Court on September 30, 2010, seeking to compel the Fishers Town Council to schedule their petition for a referendum. They voluntarily dismissed that suit and refiled in U.S. District Court on December 30, 2010.

While the litigation continued, the commission studying the Fishers/Fall Creek merger approved the reorganization plan on November 11, 2010. In its final form, the reorganization plan proposed reorganizing the Town of Fishers and Fall Creek Township along the following lines:

(1)     The Town of Fishers and the Township would merge into a single political subdivision;

(2)     The new political subdivision, called the City of Fishers, would become a "nontraditional" second class city that combined attributes of a second class city and a town;

3

(3) The citizens of Fishers would elect a nine-member City Council at large;

(4) The City Council would appoint a City Mayor to a four-year term by a majority vote;

(5) The City Mayor would not have the power to veto ordinances passed by the City Council;

(6) The City Council would approve a City Manager recommended by the City Mayor by a majority vote;

(7) The existing Town Council Members and the Township trustee would remain in office as part of the new City Council until municipal elections in 2015.

(Joint App. at 38; Joint Add. at 5–10.)

On December 20, 2010, the Fishers Town Council and the Township held a public meeting during which both entities adopted the final reorganization plan. A referendum on the reorganization plan will occur in the November 2012 general election.

On February 21, 2011, the Town Council passed a resolution acknowledging the Plaintiffs' petition to incorporate the Town of Fishers into a second class city. The resolution further ordered a referendum on that proposal in the next general election, the same election in which residents would vote on the reorganization plan.

Back in federal court, the Defendants moved to dismiss the Plaintiffs' complaint, arguing that it failed to present a federal question, thereby depriving the District Court of subject matter jurisdiction. The court denied the Defendants' motion to dismiss but otherwise abstained from acting so a state court would have a chance to address a novel question of state law that might

allow the District Court to avoid needlessly addressing a constitutional question. The Plaintiffs moved to reopen the case and further moved to certify that question to this Court.[2]

## I.    The Path Away from the Dillon Rule

Like many other states, Indiana historically adhered to the Dillon Rule that a municipal corporation could exercise only the following powers:

> First, those granted in <u>express words</u>; second, those <u>necessarily or fairly implied in</u>, or <u>incident</u> to, the powers expressly granted; third, those <u>essential</u> to the declared objects and purposes of the corporation—not simply convenient, but indispensable.

<u>Tippecanoe Cnty. v. Ind. Mfr.'s Ass'n</u>, 784 N.E.2d 463, 465 (Ind. 2003) (citing Dillon, <u>Municipal Corporations</u> (1st ed. 1872) (emphasis in original)). A corollary rule of construction required that a court resolve any reasonable doubt concerning the existence of a power against the corporation and enjoin the corporation from exercising it. <u>See</u> <u>id.</u>

Under the Dillon Rule, a person who simply found himself on the wrong side of some local action could easily challenge that action by essentially arguing that it was <u>ultra</u> <u>vires</u>. <u>See, e.g.</u>, <u>City of S. Bend v. Chicago, S.B. & N.I. Ry. Co.</u>, 179 Ind. 455, 458, 101 N.E. 628, 629 (Ind. 1913) ("[T]he charter of South Bend delegated no power for the enforcement of the ordinance in controversy . . . ."). The resulting legal landscape handcuffed municipal corporations, preventing them from taking a wide range of governmental actions we might find commonplace today. <u>See, e.g.</u>, <u>Pittsburgh, C., C. & St. L. Ry. Co. v. Town of Crown Point</u>, 146 Ind. 421, 45 N.E. 587

---

[2] We have recently expressed concern over using the certified question process in an apparent attempt to bypass the Indiana trial courts. <u>Snyder v. King</u>, 958 N.E.2d 764 (Ind. 2011). Here, it seems that there was plenty of procedural maneuvering on both sides of the v., so we have set aside our concerns out of comity with the District Court.

(1896) (town could not enforce ordinance requiring railroad to post watchmen and maintain gates at crossings at railroad's expense because statute authorizing ordinances to prevent nuisances did not provide so specifically).

Recognizing the disadvantages of the Dillon Rule, the Legislature abrogated it in 1971, when it passed the Indiana Powers of Cities Act. Act of April 14, 1971, P.L. 250-1971, § 1, 1971 Ind. Acts 955, 967. The Legislature expanded the applicability of this reforming principle in 1980, when it passed the Indiana Home Rule Act. Act of February 27, 1980, P.L. 211-1980, § 1, 1980 Ind. Acts 1657, 1659–62 (codified as amended at Ind. Code §§ 36-1-3-1 to -9 (2007)). In addition to reaffirming the abrogation of the Dillon Rule, the Home Rule Act provides that in general, a unit is presumed to possess broad powers of local government, unless the Indiana Constitution or a statute expressly denies the unit that power, or expressly grants it to another entity. Ind. Code § 36-1-3-5 (2007); see also City of Gary ex rel. King v. Smith & Wesson Corp., 801 N.E.2d 1222 (Ind. 2003) (city could file public nuisance claim against handgun manufacturer when statute authorizing public nuisance claims did not specifically address regulating handguns).

## II.    The 2006 Act:  A Further Step

Against this ever-liberalizing landscape, the Legislature passed the Indiana Government Modernization Act. Act of March 24, 2006, P.L. 186-2006, § 4, 2006 Ind. Acts 3892, 3893 (codified as amended at Ind. Code §§ 36-1.5-1-1 to -5-8 (2007 & Supp. 2011)). The Act grants political subdivisions "full and complete authority" to reorganize, exercise governmental functions under a cooperative agreement, and transfer responsibilities between offices and officers. Ind. Code § 36-1.5-1-2.

A reorganization includes a change in the structure or administration of a political subdivision involving (1) a consolidation of two or more political subdivisions; or (2) one of multiple other "allowable actions" set out in Indiana Code § 36-1.5-4-4. Ind. Code §§ 36-1.5-2-

5, -4-3. Among those other allowable actions, a reorganizing political subdivision may transfer the functions of an office to another office; and provide for a legislative body, an executive, or a fiscal body of the reorganized political subdivision to exercise the powers of the reorganizing political subdivision's legislative body, executive, or fiscal body. Ind. Code § 36-1.5-4-4(3)–(4).

It appears as though at least two political subdivisions must be involved for a reorganization to occur, see Ind. Code § 36-1.5-4-1, though it may be that Article 1.5 supplies some unidentified additional options. Section 36-1.5-4-1(a) tends to list out political subdivisions of the same type. Ind. Code § 36-1.5-4-1(a)(1)–(6). In particular, it permits reorganizations between two or more municipalities, which would include cities and towns. Ind. Code § 36-1.5-4-1(a)(3); see also Ind. Code § 36-1-2-11 (2007) ("municipality" includes "city" and "town"). But it also allows political subdivisions of different types to reorganize. Ind. Code § 36-1.5-4-1(a)(7)–(11). Regardless, this section does not, at least by its terms, limit the resulting forms the reorganized political subdivision may take.

The Modernization Act provides two mechanisms for initiating a reorganization: a resolution and a petition. Ind. Code § 36-1.5-4-9 to -11. In either case, a reorganization study commission must adopt a reorganization plan that needs to include, among many other things,

> A description of the membership of the legislative body, fiscal body, and executive of the reorganized political subdivision, a description of the election districts or appointment districts from which officers will be elected or appointed, and the manner in which the membership of each elected or appointed officer will be elected or appointed.

Ind. Code § 36-1.5-4-18(b)(4). After a political subdivision's legislative body approves the plan, it may take effect only after that political subdivision's voters approve it by referendum. Ind. Code § 36-1.5-4-32.

Once the voters approve a reorganization, "[t]he political subdivisions are reorganized in the form and under the conditions specified by the legislative bodies of the reorganizing political

subdivisions in the plan of reorganization filed with the county recorder." Ind. Code § 36-1.5-4-34(b).

### III.  The Non-Traditional City Idea

Perhaps the centerpiece of the Plaintiffs' contention is that the Town Council's reorganization plan strips them of their chance to vote for a mayor, who is typically the executive head of a second class city.  Whether the chance to vote for such an executive is imbedded in Indiana law is not a constitutional question, but rather statutory.  After all, the Indiana Constitution provides:  "All officers, whose appointment is not otherwise provided for in this Constitution, shall be chosen in such manner as now is, or hereafter may be, prescribed by law."  Ind. Const. art. 15, § 1.

Thus, the Plaintiffs' contentions rest on various statutes about reorganizations, elections, and municipal structure.  For example:  "[A]fter the voters approve a reorganization, one (1) set of officers for the reorganized political subdivision . . . shall be elected . . . as prescribed by statute."  Ind. Code § 36-1.5-4-36(b) (emphasis added).  Subsections like the foregoing, Plaintiffs argue, demonstrate that the Government Modernization Act mandates that a reorganized city's voters elect a city mayor and city council in the same manner Indiana Code §§ 36-4-5-2, and -6-3(i) (2007) require of any other second class city.  (Plaintiffs' Br. at 9–10.)

The Plaintiffs' contentions about Section 36(b) and other provisions are plausible, but they are best characterized as inference.  The Act itself hardly supplies explicit support for Plaintiffs' position.  As for inferences, it is also plausible to read "as prescribed by statute" as referring simply to the time, place, and manner of conducting municipal elections.

The General Assembly has given us a guiding principle for resolving such subtleties.  It has declared that we should liberally construe the Modernization Act to effect its purposes.  Ind. Code § 36-1.5-1-5.  The Act gives to all local governments what it calls "full and complete

authority" to reorganize, exercise governmental functions under a cooperative agreement, and transfer responsibilities between offices and officers. Ind. Code § 36-1.5-1-2. Except as otherwise provided in the Act itself, no other law, procedure, proceeding, or other act by a political subdivision, or by the state, is a prerequisite before the political subdivision exercises that authority. Ind. Code § 36-1.5-1-3. Finally, the Act controls over any inconsistent law unless specifically provided otherwise. Ind. Code § 36-1.5-1-6.

In light of the Legislature's directives about construing the Act's provisions, we conclude that Article 1.5 does indeed allow a municipality to reorganize into a city even though the reorganization plan provides for a city council elected at large and a city mayor appointed by the city council. If citizens approve a reorganization plan that describes the membership of new political branches and the manner in which those members will attain office, then the reorganization may proceed along those lines.

While one might wonder what individual elements of the general manner of elections for cities and towns need persist after an Article 1.5 reorganization, we will not adopt a "Dillonist" mindset in trying to answer that question. Indeed, as the long march away from the Dillon Rule makes plain, it is far less burdensome on both the courts and the Legislature for the law to presume the existence of local authority to act absent some express prohibition, than it is to require legislation spelling out every detail of every permissible action a municipality may take. So the General Assembly has said, several times over multiple recent decades.

## Conclusion

We therefore answer the District Court's certified question in the affirmative.

Dickson, Sullivan, Rucker, and David, JJ., concur.